Filed 12/13/22 P. v. Castro CA3

<u>NOT TO BE PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EDUARDO AGUILAR CASTRO,<br><br>    Defendant and Appellant. | C093216<br><br>(Super. Ct. No. CR20201336) |

A jury convicted defendant Eduardo Castro on 10 counts of committing a lewd act upon a child under the age of 14 and four counts of committing a lewd act upon a child aged 14 or 15. The jury found true multiple-victim special circumstance allegations. The trial court sentenced defendant to an aggregate determinate term of four years in prison and a total indeterminate term of 120 years to life.

Defendant now contends (1) there is insufficient evidence to support the lewd act convictions on counts 8 and 14, (2) the trial court should not have admitted defendant's pretrial statement to a detective because defendant did not receive a complete advisement under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 614] (*Miranda*), (3) we should review sealed portions of the reporter's transcript to determine whether any discoverable material was improperly withheld, (4) the trial court abused its discretion in admitting expert testimony that false sexual abuse allegations by children are very rare,

1

(5) it was error to give a modified CALCRIM No. 207 instruction that permitted the jury to disregard the age elements on certain counts, and (6) the trial court should have instructed on the lesser included offense of an attempted lewd act in connection with count 15.

We conclude (1) substantial evidence supports the convictions on counts 8 and 14, (2) the *Miranda* advisement given to defendant was adequate, (3) nothing in the sealed portions of the reporter's transcript indicate that any document was improperly withheld from defendant, (4) although the trial court should not have allowed the expert to testify that it was very rare for children to lie about sexual abuse, the error was harmless, (5) the trial court did not err in giving the modified CALCRIM No. 207 instruction, and (6) the trial court was not required to instruct on an attempted lewd act in connection with count 15.

We will affirm the judgment.

## BACKGROUND

G.N. (mother) had three daughters, V. (born in 1986), G. (born in 1988), and N. (born in 1989). The children were born in Mexico and joined mother in the United States when V. was 7. Mother married defendant in the United States and had three children with him.

The family lived in a one-bedroom apartment behind a market in Knights Landing. Witnesses had different recollections about how long the family lived at that location.

The family subsequently lived in a four-bedroom apartment in Woodland for about five years. The family ultimately moved to a house on Railroad Street in Knights Landing, where defendant and mother lived in March 2020.

V. testified that defendant touched her vagina six or seven times, beginning when she was eight or nine. Those incidents were the basis for the charges in counts 2, 3 and 4. On one occasion, defendant pulled V.'s pants down while she was asleep next to her sisters and touched V.'s vagina. It was early in the morning. Defendant had his pants

2

down and was trying to put his penis inside V. Mother walked in and interrupted him. That incident was the basis for the count 1 charge.

At trial, mother corroborated V.'s description of the count 1 incident. Mother testified that when V. was 12 and the family lived at the market apartment, mother walked into the bedroom in the early morning hours and saw defendant with his penis out and "very large." Mother testified that defendant was about to rape V., who was on the bed with her sisters and a cousin. Mother saw defendant grabbing V.'s vagina. Mother hit defendant.

N. corroborated the count 1 incident in part. She recalled waking up to V. crying at 5 or 6 a.m. when the family lived at the market apartment. N. slept on the same bed as V. N. recalled seeing mother slap defendant, push him out of the room, lock the door and ask V. what had happened. N. said V. appeared to be in shock, was crying and would not say anything.

G. testified that defendant touched her inappropriately more than 40 times. The incidents occurred at night when everyone was asleep. Defendant touched and kissed G.'s breasts over her clothing multiple times. When G. was six, defendant touched and tried to kiss her breasts and tried to touch her vagina but G. pushed him away. One time when N. was asleep next to G., defendant touched G.'s vagina, making skin-to-skin contact. That incident occurred when G. was about 10 and the family lived in Woodland. Defendant tried to insert his finger inside G.'s vagina but G. kicked him and he left the room. On another occasion, defendant pulled G.'s pants down when she was asleep, and he tried to put his face on G.'s vagina but she kicked him. Defendant last touched G. sexually when she was 16. He went into her bedroom at the Woodland home at night and tried to touch G. but she pushed him away.

N. testified that defendant touched her sexually on two occasions when the family lived in Woodland and N. was around 13 or 14. Detective Tonya Oropeza testified that during a pretrial interview, N. said the inappropriate touching occurred when N. was 14.

3

At trial, N. recounted that the first incident occurred when she was asleep next to G. N. felt something that woke her. She saw defendant pulling her pants down. Defendant left the room when he realized N. was awake. A few months later, defendant touched N.'s leg, close to her groin area, as he helped N. with an ingrown toenail. Defendant instructed N. to take a shower and walked into the bathroom as she was showering.

N. saw defendant engage in inappropriate conduct toward V. and G. She saw defendant look up V.'s skirt when V. was 14. She saw defendant pull up the blanket and get next to G. on the bed when the family lived in Woodland. G. did not wake up. Defendant left the room when N. coughed. Another time, she saw defendant try to touch G.'s leg when G. was washing dishes.

V. started using drugs and drinking in the seventh grade. Her children, including B., lived with defendant and mother because of her problem with drugs. B. recalled she moved in with defendant and mother when she was four or five.

B. testified that defendant touched her sexually once a week when they lived at the Railroad Street house in Knights Landing. When she was about seven, defendant grabbed her breasts when she was on a swing. B. testified that defendant touched her buttocks or breasts many times before she turned 14. On more than five occasions, defendant went into her bedroom at night and touched her when she forgot to lock the door. Those incidents occurred before she turned 14. She always woke up before defendant put his finger inside her vagina. On one occasion, as B. was entering mother's bedroom to get something for her, defendant grabbed B.'s hand and moved it toward his penis while his other hand pulled on the front of his pants. B. moved her hand away and left the room. Defendant last touched B. in 2018 or 2019. On that occasion, B. woke up when she felt defendant touching her vagina. Defendant had pulled B.'s underwear down. B. hit defendant and pushed him away and he left the room.

V. testified that defendant looked at her inappropriately. N. likewise testified that defendant stared at her body when she was about 12 up until she was 20 and she saw

4

defendant staring at G.'s breasts and buttocks. B. also testified that defendant stared at her. Mother corroborated that defendant looked at V., G., B. and N.'s bodies in an inappropriate manner almost daily. Mother instructed B. to lock her bedroom door because mother did not trust defendant.

V., G., B., and N. testified about disclosing what defendant did to them. For example, V. told an elementary school teacher about being touched sexually, but did not provide names or details. The People presented trial testimony from four witnesses about V., G., B., and N.'s disclosures to them.

B. did not tell her aunts and mother that defendant was touching her sexually despite their inquiries as she was growing up. However, she blurted it out in anger on March 14, 2020. V., G., B., and N. were discussing B.'s quinceañera when B. expressed anger at V., G. and N. for leaving B. with defendant when defendant had sexually molested them. B. told them defendant was touching her sexually.

V. and G. confronted defendant. V. accused defendant of touching B. Defendant denied it and claimed B. was lying. V. and G. also accused defendant of touching them and N. Defendant denied those accusations but repeatedly asserted that V. looked for him to do that to her. G. testified that defendant told V., "You wanted to." Mother testified that defendant stated twice that if he did something to V., she was looking for it. G. called the authorities.

A social worker interviewed B. about her allegation at the Multi-Disciplinary Interview Center (MDIC) on March 17, 2020. The People played a video recording of that interview at the trial. B. testified she did not disclose everything during her MDIC interview because she "didn't want to talk about it."

G. made a pretext call to defendant on March 18, 2020. The prosecutor played a recording of the call for the jury. G. referenced certain sexual conduct by defendant during the call and defendant claimed not to remember those incidents. He asked whether G. was recording their conversation.

5

Law enforcement officers interviewed defendant on March 19, 2020. A video recording of the interview was also played at the trial. Defendant denied touching G. and B. and repeatedly stated "let them show the proof." Defendant said V. accused him of violating B. out of anger and it was possible that V. was a liar. He questioned why G. would not tell mother if something had happened. He asked why people did not accuse him before. But defendant admitted touching V. He said V. wanted to do "sex-like things" to him once. After denying it initially, he said V. asked him to touch her when they were at the market apartment and he touched her over her clothes. He said he did not have sex with her. He said mother came in and got angry with him.

Dr. Anna Washington testified as the prosecution expert on Child Sexual Abuse Accommodation Syndrome (CSAAS). We will discuss her testimony below.

Defendant presented the testimony of his brother, niece, and daughter E. All three testified they never saw defendant touch any of the children inappropriately.

The jury found defendant guilty on 10 counts of committing a lewd or lascivious act upon a child under 14 (Pen. Code, § 288, subd. (a)):[1] count 1 (the touching of V. interrupted by mother around April 1997 to April 1999); count 2 (the touching of V.'s vagina around April 1995 to April 1996); count 3 (the touching of V.'s vagina around April 1996 to April 1997); count 4 (the touching of V.'s vagina around April 1997 to April 1998); count 5 (the touching of G.'s breasts around September 1995 to September 2002); count 6 (the touching of G.'s vagina around September 1995 to September 2002); count 7 (the touching of G.'s vagina around September 1995 to September 2002); count 9 (the touching of B.'s breasts while she was on a swing around April 2013 to April 2015); count 12 (the effort to place B.'s hand on his penis around April 2013 to April 2019); and count 13 (the pulling down of B.'s pants while she slept around April 2012 to April

_____

[1] Undesignated statutory references are to the Penal Code.

6

2019). In addition, the jury found true the section 667.61, subdivision (e)(4) multiple-victim special circumstance allegations in those counts.

The jury also found defendant guilty on four counts of committing a lewd or lascivious act upon a child who is 14 or 15 (§ 288, subd. (c)(1)): count 8 (the pulling down of G.'s underwear and touching her vagina in Woodland around September 2002 to September 2004); count 14 (the lewd act upon B. in May 2019); count 15 (the lewd act upon N. around August 2003 to August 2004); and count 16 (the touching of N.'s upper leg in checking her toe for infection around August 2003 to August 2006).

The jury found defendant not guilty on counts 10 and 11 (§ 288, subd. (a)) in relation to B., and also found him not guilty on the lesser included offense of an attempted lewd act on those counts. Moreover, it found not true the section 667.61, subdivision (e)(4) allegations associated with those counts.

The trial court sentenced defendant to an aggregate determinate term of four years in prison and a total indeterminate term of 120 years to life.

We provide additional background in the discussion as relevant to the contentions on appeal.

DISCUSSION

I

Defendant claims there is insufficient evidence to support his convictions on counts 8 and 14. We will address each count in turn.

A

Defendant was convicted on count 8 for committing a lewd or lascivious act upon G. when she was 14 or 15. He contends there is no substantial evidence that G. was 14 or 15 at the time of the acts underlying count 8.

In determining whether sufficient evidence supports a conviction, " 'we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence --

7

evidence that is reasonable, credible and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Nelson* (2011) 51 Cal.4th 198, 210.)

Count 8 alleged that defendant violated section 288, subdivision (c)(1) by pulling down G.'s underwear and touching her vagina when the family lived in Woodland. A defendant violates section 288, subdivision (c)(1) when he "willfully and lewdly commits any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child" who is 14 or 15 years of age, with the intent of arousing, appealing to or gratifying the lust, passions or sexual desires of the defendant or the child and the defendant is at least 10 years older than the child. (§ 288, subds. (a), (c)(1).)

G. testified that when they lived in Woodland, defendant touched her vagina, making skin-to-skin contact, and tried to put his finger inside her vagina. She recalled the count 8 incident occurred when she was "probably like 10." The prosecutor argued in his closing statement that G. was incorrect about being 10 at the time of the count 8 incident because the family moved to Woodland when G. was 14 or 15.

Substantial evidence supports the prosecutor's argument and jury finding that G. was 14 or 15 at the time of the count 8 acts. In particular, mother testified that G. was 15 when the family moved to Woodland. The testimony of a single witness is sufficient to support a conviction unless it is physically impossible or inherently improbable (*People v. Young* (2005) 34 Cal.4th 1149, 1181 (*Young*)), circumstances that are not present here.

Although other testimony by mother suggested that G. could have been as old as 18 when the family moved from the market apartment to Woodland, such a conflict or inconsistency in testimony, even from the same witness, is resolved by the trier of fact. (*Young, supra*, 34 Cal.4th at p. 1181; *People v. Koontz* (1959) 171 Cal.App.2d 633, 634 [where sexual assault victim gave conflicting testimony about whether penetration occurred, trier of fact "was entitled to accept as true the testimony of the [victim] on direct examination rather than the conflicting testimony which she later gave"].) In a

8

sufficiency of the evidence claim, "we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment . . . ." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Based on mother's testimony that G. was 15 when the family moved to Woodland and G.'s testimony that the count 8 incident occurred in Woodland, the jury reasonably could have found that G. was 15 when defendant committed the acts alleged in count 8.

B

Defendant also challenges the sufficiency of the evidence supporting the count 14 conviction. He contends insufficient evidence showed that defendant committed the last lewd act upon B. after she turned 14.

Count 14 alleged that defendant committed a lewd or lascivious act upon B. with the requisite lewd intent on or about and around May 1, 2019 and May 31, 2019, in violation of section 288, subdivision (c)(1). B. was born in April 2005, so she would have been 14 years old at the time of the count 14 act. The amended information did not specify a particular act for count 14.

As we have explained, section 288 subdivision (c)(1) requires proof that the defendant committed a lewd or lascivious act upon a child who is 14 or 15. (§ 288, subds. (a), (c)(1).) Although B. testified that defendant went to her bedroom at night and touched her more than once before she turned 14, she also said she believed defendant last touched her sexually a year or two before the trial, i.e., October 13, 2018 to October 13, 2019, when B. was 13 or 14. B. said defendant touched her vagina when she was asleep in her bedroom. Based on B.'s testimony, the jury could have reasonably found that B. was 14 years old at the time of the count 14 conduct.

9

## II

Defendant next contends the trial court erred in admitting his pretrial statement to Detective Oropeza because the *Miranda* warning the detective provided was incomplete. Defendant says Detective Oropeza failed to advise him of his right to counsel during the interrogation and that anything he said could be used against him.

### A

Before trial, defendant moved to exclude his pretrial statement on the ground that Detective Oropeza provided an incomplete and incorrect *Miranda* advisement. Detective Oropeza testified at an Evidence Code section 402 hearing in relation to the motion. She testified as follows.

Detective Oropeza interviewed defendant on March 19, 2020. The detective took Spanish classes in school, came from a Mexican heritage, had family members who spoke only Spanish, and spoke Spanish to many people in the course of her duties as a law enforcement officer. She had given the *Miranda* advisement in Spanish about three times before this case. She read the *Miranda* warning to defendant in Spanish from a card.

Defendant and the People provided English translations for the *Miranda* advisement Detective Oropeza gave defendant. The prosecutor's translation was as follows:

"[Detective Oropeza]: So first, you have the right to remain silent, . . . do you understand? . . . yes?

DEFENDANT: mm.hmm.

[Detective Oropeza]: Yes? . . . OK . . . Anything you say can be used against you in court . . . do you understand? . . . yes?

DEFENDANT: Yes.

10

[Detective Oropeza]: If you cannot afford to hire a lawyer, one will be assigned to represent you before any questioning . . . do you understand? . . . do you have any questions?

DEFENDANT: mm.hmmm. . . . No

[Detective Oropeza]: Ok . . .You can also set aside your right to remain silent and your right to hire a lawyer and proceed to answer any question or make any comment you wish. If you decide to claim your right to hire an attorney . . . do you understand?

DEFENDANT: Yes.

[Detective Oropeza]: Do you understand what I just said?

DEFENDANT: Yes.

[Detective Oropeza]: Everything?

DEFENDANT: Yes.

[Detective Oropeza]: Do you understand? . . . OK

[¶] . . . [¶]

[Detective Oropeza]: OK . . . wait a moment . . . OK?

DEFENDANT: Yes."

Defendant provided the following translation:

"[Detective Oropeza]: So, first, you . . . have the right to remain silent. Do you (already) understand?

[Defendant]: huh-uh [Yes]

[Detective Oropeza]: Yes?, ok. . . . Anything you might say can and will be used against . . . in court. Do you (already) understand? [¶] Yes?

[Defendant]: Yes.

[Detective Oropeza]: Ok. [¶] If you do not have the economic means to hire a lawyer, one will be assigned to you in order to represent you before do [*sic*] interrogation. Do you (already) understand?

[Defendant]: huh-uh [Yes]

11

[Detective Oropeza]:  You don't have any questions?

[Defendant]:  No.

[Detective Oropeza]:  Ok.  [¶]  You also can put aside your right to a lawyer and your right to remain silent and you can answer any question or make any comment you want to [no pause] if you decide to demand your right to hire a lawyer, . . . do you (already) understand?

[Defendant]:  Yes.

[Detective Oropeza]:  Do you understand what I have told you?

[Defendant]:  Yes.

[Detective Oropeza]:  Everything?

[Defendant]:  Yes."

Defendant called Dr. Robert Blake, a retired UC Davis Spanish linguistics professor, as a witness at the hearing.  Dr. Blake said many portions of Detective Oropeza's statements were difficult to understand because they were not in "proper Spanish" and some things were "just not understandable."  Dr. Blake testified that Detective Oropeza did not say the word "you" in the last part of the sentence "Anything you might say can and will be used against . . . in court."

The People called Miriam Franco as their Spanish language expert.  Franco was a legal secretary in the District Attorney's office who was bilingual.  Franco listened to the recording of Detective Oropeza's interview of defendant and reviewed the People's English translation for accuracy.  Franco testified that even though the second "you" was not stated in Spanish in the sentence "Anything you say can be used against you in court," the People's English translation of the sentence, which included the second "you," was correct.

The trial court denied defendant's motion to exclude his pretrial statement.  It found that the video recording showed defendant indicated he understood what Detective Oropeza said in the advisement and defendant did not ask any questions when the

12

detective asked him if he understood what she had said. The trial court concluded that under the totality of the circumstances, the advisement was adequate and defendant understood and waived his rights.

B

As a prophylactic measure "to counteract the coercive pressure inherent in custodial surroundings" (*People v. Williams* (2010) 49 Cal.4th 405, 425 and protect a suspect's Fifth Amendment privilege against self-incrimination, the United States Supreme Court announced in *Miranda* that prior to any custodial interrogation law enforcement agents must advise a suspect "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." (*Miranda, supra*, 384 U.S. at p. 479; see *People v. Suarez* (2020) 10 Cal.5th 116, 157 (*Suarez*).) The *Miranda* warnings are a prerequisite to the admissibility of any statement made by a defendant. (*Miranda,* at p. 476.) However, the *Miranda* warnings need not be given in the exact form described by the United States Supreme Court in *Miranda*. (*Duckworth v. Eagan* (1989) 492 U.S. 195, 202 [106 L.Ed.2d 166]; *Suarez,* at p. 159.) " 'Reviewing courts . . . need not examine *Miranda* warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably "conve[y] to [a suspect] his rights as required by *Miranda*." ' " (*People v. Kelly* (1990) 51 Cal.3d 931, 948-949; accord *Suarez*, at p. 159.) On appeal, we review independently whether a *Miranda* advisement was adequate. (*Williams,* at p. 425; *People v. Wash* (1993) 6 Cal.4th 215, 235-236 (*Wash*).)

In *Wash*, the defendant was advised " 'you have the right to have an attorney present before any questioning if you wish one, if you cannot -- if you cannot afford . . . an attorney one will be provided to you at no cost before any questioning begins.' " (*Wash, supra*, 6 Cal.4th at p. 236.) The defendant asserted that the warning was

13

incomplete because he was not informed that he was entitled to counsel during questioning. (*Ibid.*) The California Supreme Court rejected the claim, concluding that although the warning given did not state that the defendant had the right to counsel both before and during questioning, the advisement would not have led the defendant to believe that counsel would be provided before questioning and then summarily removed once questioning began. (*Id.* at pp. 236-237.) The Supreme Court said the *Miranda* advisement "need not be presented in any particular formulation or 'talismanic incantation.' " (*Id.* at p. 236.) The warnings given need only reasonably convey to the defendant his or her right to have an attorney present during questioning and the warning in that case was sufficient. (*Id.* at p. 237.)

In *People v. Valdivia* (1986) 180 Cal.App.3d 657, the defendant was advised in Spanish, " 'You have the right of attorney, to speak with an attorney and to have him present before any question; do you understand me?' " (*Id.* at p. 661; see *id.* at p. 662.) While noting a contrary conclusion by some federal circuit courts, including two cases defendant cites in his appellate briefs, the appellate court in *Valdivia* was not persuaded that the warning given in that case would have caused most people to believe that counsel would only be provided before questioning and then whisked away once questioning started. (*Id.* at pp. 662-664.) The appellate court concluded that the warning given communicated that the defendant had a right to consult with and have counsel physically present before and during interrogation. (*Id.* at p. 663-664.)

The warning in this case is similar to the ones given in *Wash* and *Valdivia*. Detective Oropeza told defendant in Spanish, "If you cannot afford to hire a lawyer, one will be assigned to represent you before any questioning" or "If you do not have the economic means to hire a lawyer, one will be assigned to you in order to represent you before do [*sic*] interrogation." That advisement followed the warning that defendant had the right to remain silent. Under the reasoning in *Wash* and *Valdivia*, we conclude the warning Detective Oropeza gave defendant sufficiently advised defendant of his right to

14

the presence of counsel. We are not bound to follow the federal courts of appeals decisions that defendant relies upon. (*People v. Williams* (2013) 56 Cal.4th 630, 668; *People v. Crittenden* (1994) 9 Cal.4th 83, 120, fn. 3.)

Defendant argues *Florida v. Powell* (2010) 559 U.S. 50 [175 L.Ed.2d 1009] overruled *Wash*, but we find it distinguishable. In *Powell*, the defendant was advised, in pertinent part, " 'You have the right to talk to a lawyer before answering any of our questions. If you cannot afford to hire a lawyer, one will be appointed for you without cost and before any questioning. You have the right to use any of these rights at any time you want during this interview.' " (*Id.* at p. 54.) The United States Supreme Court held the advisement satisfied *Miranda*. (*Id.* at p. 53.) However, the advisement provided in *Powell* was different from the ones provided in *Wash* and this case, and the Court in *Powell* did not decide whether an advisement like the one provided here violated *Miranda*.

We also reject defendant's claim that he was not warned that any statement he made could be used against him. "The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. This warning is needed in order to make him aware not only of the privilege [against self-incrimination], but also of the consequences of forgoing it. . . . Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system -- that he is not in the presence of persons acting solely in his interest." (*Miranda, supra*, 384 U.S. at p. 469.)

According to defendant's translation, the relevant portion of Detective Oropeza's advisement said "Anything you might say can and will be used against . . . in court." The People's Spanish language expert testified that the correct translation was "Anything you say can be used against you in court." Either way, it was clear defendant knew he was in an adversarial setting, that he was accused of violating the law, and that anything he said could be used in court. His contention lacks merit.

III

Defendant asks this Court to review pages 122 to 138 and 395 to 398 of the reporter's transcript, which relate to in camera hearings by the trial court, to determine whether any discoverable material was improperly withheld from defendant. The Attorney General does not oppose the request.

We have reviewed the sealed portions of the reporter's transcript. At pages 122 to 138, the trial court held an in camera hearing with the prosecutor and a Child Protective Services (CPS) representative to discuss whether there were any CPS records relating to sexual abuse and N. or G. After the hearing, the trial court told defendant's trial counsel about the nature of the in camera hearing and the people who appeared at the hearing. In particular, the trial court said there were no additional records relating to N. or G. and the trial court did not expect that any new records would be produced. Defendant's trial counsel confirmed receipt of a seven-page document that was referenced at the in camera hearing.

At pages 395 to 398 of the reporter's transcript, the CPS representative disclosed, during a second in camera hearing, two documents relating to a person who had the same name as G. but a different birthdate. The trial court reviewed the documents, noted that the person referenced in the documents did not have the same birthdate as G., and concluded she was not the same person as G. We find nothing in the sealed portions of the transcript indicating that any document was improperly withheld from defendant.

IV

Defendant further contends the trial court abused its discretion in permitting Dr. Washington to testify on redirect examination that false sexual abuse allegations by children were very rare. The Attorney General concedes the trial court erred in admitting the testimony but argues the error was harmless.

16

## A

Defendant moved in limine to preclude Dr. Washington from testifying about statistical data and "common situations where children might lie or make false allegations." The trial court excluded statistical evidence on the frequency of false sexual abuse allegations by children.

Dr. Washington did not testify about false sexual abuse allegations during direct examination. During cross examination, defendant's trial counsel asked whether it was appropriate to apply CSAAS to false allegations of sexual abuse. Dr. Washington responded that CSAAS was developed to understand children who had been sexually abused; therefore, CSAAS would not be helpful to understand children who had not been abused. She also explained that CSAAS was not a tool used to diagnose abuse, test whether someone was abused, or determine whether a particular defendant was guilty. It was simply a framework for understanding common reactions to sexual abuse. Dr. Washington agreed it was possible that not every child who reported sexual abuse was telling the truth. In response to questioning, Dr. Washington explained suggestibility and false memories. She said it would be difficult to suggest to a child something traumatic had happened to them when it had not, or for a child to report something that would be out of his or her experience. But she agreed that there were cases when a child described something of a graphic nature that they did not actually experience. She said there was research on false allegations and when they occurred. In response to questions about interviewing children regarding sexual abuse, Dr. Washington said the research showed that false allegations were more likely to be made by adults, the occurrence of false allegations was slightly higher in contentious custody cases, and no studies suggested that an immediate responder, whether a teacher, sibling or adult, significantly biased the outcome of criminal court cases or forensic interviews.

Outside the presence of the jury, the prosecutor objected that defendant's trial counsel had asked Dr. Washington whether false allegations could occur. The prosecutor

17

pointed out that the trial court had precluded the People from asking Dr. Washington how frequently false allegations occurred. Defendant's trial counsel responded that she could elicit testimony that false allegations occurred without opening the door for the People to elicit a statistical or quantitative measure for the frequency of false allegations. As a result of the discussion, the trial court allowed the prosecutor to ask Dr. Washington on redirect examination whether false allegations were rare or common, but not about statistical information.

The prosecutor asked Dr. Washington on redirect examination about her prior testimony regarding false allegations. Dr. Washington responded that research showed that when false allegations occurred they tended to be by adults and in the context of custody disputes. She said it was known that false allegations could occur but were very rare.

B

While expert testimony on CSAAS is admissible when relevant for the limited purpose of evaluating the credibility of an alleged child sexual abuse victim, an expert witness may not opine that it is rare for children to make false allegations of sexual abuse. (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 166, 179-180 (*Lapenias*); accord *Lopez v. State* (2009) 288 S.W.3d 148, 156 [2009 Tex.App. Lexis 2056]; *Lane v. State* (2008) 257 S.W.3d 22, 24-25, 27 [2008 Tex.App. Lexis 3729]; *State v. Lindsey* (1986) 720 P.2d 73, 75-76 [149 Ariz. 472].) This is because the determination of a witness's credibility is not a subject sufficiently beyond common experience that an expert's opinion would assist the trier of fact; therefore, an expert witness may not give an opinion as to whether another witness is telling the truth. (*Lapenias,* at pp. 176, 179-180.)

We review the erroneous admission of expert testimony for prejudice under the *People v. Watson* (1956) 46 Cal.2d 818 harmless error test, i.e., reversal is warranted only if it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error. (*Lapenias, supra*, 67 Cal.App.5th at p. 180 [rejecting

18

contention that *Chapman* test applies to error in admitting CSAAS testimony regarding rarity of false sexual abuse allegations by children]; *People v. Wilson* (2019) 33 Cal.App.5th 559, 571-572 [same with regard to error in admitting statistical evidence]; see *People v. Prieto* (2003) 30 Cal.4th 226, 247 [applying *Watson* harmless error test to erroneous admission of expert testimony]; *People v. Bledsoe* (1984) 36 Cal.3d 236, 251-252 [same].)

Dr. Washington's testimony that it was very rare for children to lie about sexual abuse was inadmissible. (*Lapenias, supra*, 67 Cal.App.5th at pp. 179-180.) However, the error in admitting the testimony was harmless. The improper testimony was very brief, occupying a very small portion of her approximately 78-page testimony. Other testimony by Dr. Washington mitigated the impact of the improper testimony. Dr. Washington acknowledged it was possible for a child to make a false sexual abuse allegation. She did not vouch for the credibility of defendant's accusers, as defendant suggests. Instead, Dr. Washington made clear that she did not know the facts of this case and was not opining whether defendant was guilty of any crimes. She told the jury the veracity of a report of abuse was outside the scope of her goal as a mental health professional and CSAAS was not a tool for testing whether someone was abused or whether a particular defendant was guilty. Moreover, although the prosecutor and defendant's trial counsel mentioned Dr. Washington's testimony during their closing arguments, neither referred to her testimony about the infrequency of false allegations. In addition, the trial court instructed the jury on the factors the jury may consider in evaluating a witness's credibility and told the jury that the jurors alone must judge the credibility of the witnesses, the jury was not bound by an expert witness's opinion, and the jury may not consider Dr. Washington's testimony about CSAAS as evidence that defendant committed any crime. We presume the jurors understood and followed the trial court's instructions. (*Lapenias,* at p. 180.) Based on the above, it is not reasonably probable that defendant would have received a more favorable result in the absence of

19

Dr. Washington's testimony that children very rarely made false allegations of sexual abuse.

Defendant asserts an ineffective assistance of counsel claim in the event we conclude that the cross-examination by his trial counsel opened the door to Dr. Washington's improper testimony. In light of our conclusion, we do not consider defendant's ineffective assistance of counsel claim.

V

In addition, defendant argues the trial court erred in instructing the jury with a modified CALCRIM No. 207 instruction.

The amended information alleged that the charged offenses occurred on or about and between certain dates. The trial court provided a modified CALCRIM No. 207 instruction as follows: "It is alleged that the crimes occurred between certain dates. The People are not required to prove that a crime took place exactly on a particular day, but only that it happened reasonably close to that day." As defendant acknowledges, CALCRIM No. 207 correctly states a general rule of law. (*People v. Rojas* (2015) 237 Cal.App.4th 1298, 1304.)

"In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled. [Citations.]" (*People v. Tate* (2010) 49 Cal.4th 635, 696.) We consider the entire charge to the jury, not parts of one instruction or a particular instruction only. (*People v. Stone* (2008) 160 Cal.App.4th 323, 331.) We presume jurors are intelligent people capable of understanding and applying all of the jury instructions given. (*People v. Gonzales* (2011) 51 Cal.4th 894, 940; *People v. Lewis* (2001) 26 Cal.4th 334, 390.)

The trial court instructed the jury to pay careful attention to all of the instructions given and to consider them together. It told the jury the prosecutor had to prove defendant's guilt of a charged offense beyond a reasonable doubt. Pursuant to CALCRIM No. 1110, the trial court instructed that in order to prove that defendant was

20

guilty of the crimes charged in counts 5, 6, 7, 12 and 13, the People had to prove that the victim was under the age of 14 at the time of the charged act. And pursuant to CALCRIM No. 1112, the trial court told the jury that in order to prove that defendant was guilty of the crimes charged in counts 8, 14, 15 and 16, the People had to prove that the victim was 14 at the time of the charged act. The trial court told the jury there were some corrections that would be made before the jury received the written jury instructions. The written instructions provided that the victim's age at the time of a section 288, subdivision (c)(1) act had to be 14 or 15.

In sum, the trial court properly instructed on the age elements of the crimes charged. (§ 288, subds. (a), (c)(1).) Read together, the CALCRIM Nos. 207, 1110 and 1112 instructions told the jury that although the People were not required to prove that crimes alleged to have occurred between specified dates took place exactly on a particular day, the People must nevertheless prove the elements for a section 288, subdivision (a) and (c)(1) violation, including that the victim was under the age of 14 at the time of the act for a section 288, subdivision (a) crime or 14 years old at the time of the act for a section 288, subdivision (c)(1) crime.

Defendant has not established that the trial court erred in giving the modified CALCRIM No. 207 instruction. Because we reject defendant's claim on the merits, we do not consider his related ineffective assistance of counsel claim.

VI

Defendant also argues that the trial court erred in not instructing the jury on the lesser included offense of attempted lewd or lascivious acts in relation to count 15.

A trial court has an obligation to sua sponte instruct on every lesser included offense that is supported by substantial evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 154-155, 160, 162.) "[T]he existence of 'any evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is

21

'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed. [Citations.] [¶] In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury. [Citations.]" (*Id.* at p. 162.) Conversely, there is no obligation to instruct sua sponte when there is no evidence that the offense was less than that charged. (*Id.* at p. 154.) The instructional duty exists regardless of the parties' requests, objections, tactics or theories at trial. (*Id.* at pp. 154-155, 160, 162-163.) We review the trial court's failure to instruct on a lesser included offense de novo. (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.)

Count 15 was based on an incident that occurred when N. lived at the Woodland home. N. testified that she woke up when she "felt something." She saw defendant's face when she awoke and saw him using his fingers to be "sneaky" in pulling her pajama pants down very slowly. N. said defendant actually touched the pajama pants she was wearing. Defendant left the room immediately when he saw that she was awake.

Defendant was charged in count 15 with violating section 288, subdivision (c)(1). As we have explained, a defendant violates section 288, subdivision (c)(1) by (1) willfully committing a lewd or lascivious act upon or with the body, or any part or member thereof, of a child; (2) with the intent of arousing, appealing to or gratifying the lust, passions or sexual desires of the defendant or the child; (3) the child is 14 or 15 years of age; and (4) the defendant is at least 10 years older than the child. (§ 288, subds. (a), (c)(1).) The elements of attempted violation of section 288, subdivision (c)(1) are (1) the defendant intended to commit a lewd or lascivious act with a child who is 14 or 15 years of age; and (2) the defendant took a direct but ineffectual step toward committing a lewd or lascivious act with the child. (*People v. Herman* (2002)

22

97 Cal.App.4th 1369, 1385; see *People v. Singh* (2011) 198 Cal.App.4th 364, 368 [stating elements of attempted violation of section 288, subdivision (a)].)

Defendant's instructional error claim focuses on the section 288 element of touching. He argues a reasonable juror could have concluded that he did not achieve his ultimate goal of touching N. sexually during the count 15 incident because he did not succeed in pulling N.'s pajama pants down and did not actually touch her vagina. He argues that a juror could have found the act of grabbing N.'s pajama pants for the purpose of pulling them down was merely preparatory and not a lewd act in itself. Defendant is wrong.

The touching element of a section 288 violation is extremely broad. (*People v. Lopez* (2010) 185 Cal.App.4th 1220, 1231 (*Lopez*).) Any touching of any part of the victim's body satisfies the first element of a section 288 violation, even if the touching is outwardly innocuous and inoffensive and does not involve the bare skin or private parts of the defendant or the child, as long as the defendant harbored the requisite lewd intent at the time of the touching. (*People v. Shockley* (2013) 58 Cal.4th 400, 404; *People v. Lopez* (1998) 19 Cal.4th 282, 289, 291; *People v. Martinez* (1995) 11 Cal.4th 434, 442-445, 450, 452 (*Martinez*).) And the touching need not occur in an inherently lewd manner. (*Martinez,* at p. 442.)

In *Martinez*, the Supreme Court emphasized that section 288 is violated by any sexually motivated touching of an underage child and section 288 does not restrict the manner in which the requisite touching can occur. (*Martinez, supra*, 11 Cal.4th at p. 442.) The Supreme Court held that the defendant's act of forcibly holding his victims in his arms under circumstances indicating no purpose other than sexual gratification was sufficient for a section 288 conviction. (*Id.* at pp. 452-453.) It stated that for purposes of finding a section 288 violation, it was irrelevant whether the defendant actually succeeded in kissing or touching the victims' breasts or whether the defendant intended to commit any additional criminal acts against the victims. (*Id.* at p. 453.) In *Lopez,*

*supra*, 185 Cal.App.4th 1220, the appellate court held that a touching within the meaning of section 288 occurred when, at the defendant's direction, the victims removed their clothing and dressed in provocative clothing the defendant told them to wear. (*Id.* at pp. 1227, 1230-1233.) In *People v. Austin* (1980) 111 Cal.App.3d 110, the appellate court concluded that a touching under section 288 occurred when, at the defendant's direction, the victim removed her own pants. (*Id.* at p. 114.) Disrobing of a child violates section 288 when it is committed for a sexually exploitative purpose. (*People v. Mickle* (1991) 54 Cal.3d 140, 176.)

Here, defendant was pulling down N.'s pajama pants when N. awoke and interrupted his effort. Defendant actually touched N. It is not relevant that N. thwarted his attempt to further touch her vagina. (*Martinez, supra*, 11 Cal.4th at p. 453.) The jury could reasonably infer from N. and the other victims' testimony that defendant had the requisite lewd intent when he was pulling N.'s pajama pants down. For example, V. testified that defendant pulled her pants down when she was asleep and touched her vagina. B. recounted a similar act by defendant against her. N. testified that defendant stared at her body when she was about 12 up until she was 20, conduct that mother corroborated.

The trial court was not obligated to instruct the jury on the lesser included offense of attempted lewd or lascivious act in relation to count 15 because there was no evidence that defendant committed an attempted lewd act upon N. only. Defendant fails to establish instructional error. (*People v. Gordon* (1985) 165 Cal.App.3d 839, 864 [stating that no instruction on the lesser included offense was required because if the defendant was guilty at all, he was guilty of the greater offense], disapproved on other grounds in *People v. Lopez, supra*, 19 Cal.4th at p. 292; see *People v. Lopez,* at pp. 287-288 [stating that the trial court's obligation to sua sponte instruct extends to lesser included offenses if the evidence " 'raises a question as to whether all of the elements of the charged offense are present' "].)

Defendant cites *People v. Perkins* (1982) 129 Cal.App.3d 15 for the proposition that acts that are preparatory to an unlawful sexual act, such as putting an arm around the victim, are not lewd or lascivious acts in and of themselves. *Perkins* followed the holding of *People v. Webb* (1958) 158 Cal.App.2d 537. (*Perkins,* at p. 20.) But the California Supreme Court has rejected the notion that acts of leading a victim by the shoulder to a secluded area and touching a victim in an unspecified way before oral copulation were too "casual" or preparatory to constitute a section 288 violation. (*Martinez, supra*, 11 Cal.4th at p. 447, fn. 14.) The Supreme Court noted that *Webb* did not discuss cases allowing conviction for all sexually motivated "touchings" and did not acknowledge that section 288 had been construed in such manner. (*Martinez,* at p. 447, fn. 14.) The Supreme Court concluded that "[a]t most, *Webb* stands for the proposition that the defendant could not be fairly punished for any touchings that were purely incidental to the oral copulation, whether or not such touchings otherwise violated section 288." (*Ibid.*, italics omitted.)

### DISPOSITION

The judgment is affirmed.

_____/S/_____

MAURO, J.

We concur:

_____/S/_____

ROBIE, Acting P. J.

_____/S/_____

EARL, J.